JOSHUA O. CATER v. NORTHWESTERN TELEPHONE EXCHANGE COMPANY.[1]

April 30, 1895.

No. 9053.

| 60 | 539 |
| 76 | 345 |
| 60 | 539 |
| 81 | 152 |
| s28LRA | 310 |
| 52LRA672n | |

**Telephone Line in Highway—Additional Servitude.**

The defendant, under legislative authority (G. S. 1894, § 2641), constructed along the side of a country highway (the fee of which was in plaintiff) a telephone line, consisting of poles planted in the ground upon which wires were strung. It did not interfere with the safety and convenience of ordinary travel, or unreasonably or materially impair plaintiff's special easements in the highway as owner of the abutting land. *Held*, that it did not impose an additional servitude upon the highway.

Action in the district court for Sherburne county to compel defendant to remove its telephone line from the highway, and to enjoin defendant perpetually from maintaining such line. The case was submitted to the court, Baxter, J., upon the pleadings and upon an agreed statement of facts. It was agreed that plaintiff was and more than twenty years had been owner in fee and entitled to the possession of the real estate on which the line was placed, excepting that the public had an easement over and across the same; and that there was and during the preceding two years had been a public·highway located in and upon the same, which highway was created by prescription and dedication. The other facts are stated in the opinion. The court found that defendant was entitled to the dismissal of the action and ordered judgment accordingly. From an order denying a motion for a new trial, plaintiff appealed. Affirmed.

[1] Reported in 63 N. W. 111.

*Oscar Taylor* and *Bruckart & Brower,* for appellant.

Plaintiff is owner of the land and has the right to exclusive occupancy and possession, subject only to the easement of the public for its use as a highway. Nicholson v. New York & N. H. R. Co., 22 Conn. 74; Trustees v. Auburn & R. R. Co., 3 Hill (N. Y.) 567; Springfield v. Connecticut R. R. Co., 4 Cush. 63; Imlay v. Union B. R. Co., 26 Conn. 249; Barclay v. Howell, 6 Pet. 498; Const. Minn. art. 1, § 13. The use to which defendant appropriated the land is not consistent with or incidental to the use by the public for a highway. Davis v. Mayor, 14 N. Y. 506; Williams v. New York C. R. Co., 16 N. Y. 97; Mahon v. New York C. R. Co., 24 N. Y. 658. The entry and appropriation of the land was an invasion of plaintiff's right. Bohlman v. Green Bay & L. P. Ry. Co., 30 Wis. 105; Wheeler v. Essex P. R. B., 39 N. J. Law, 291; Pearson v. Johnson, 54 Miss. 259; City of Chicago v. Barbian, 80 Ill. 482; Bensley v. Mountain L. W. Co., 13 Cal. 307; Pumpelly v. Green Bay Co., 13 Wall. 166; Board of Trade T. Co. v. Barnett, 107 Ill. 507; Indianapolis B. & W. R. Co. v. Hartley, 67 Ill. 439. It was not competent for the legislature to authorize the appropriation of plaintiff's property to defendant. Matter of N. Y. & H. R. Co. v. Kip, 46 N. Y. 546; Thacher v. Dartmouth B. Co., 18 Pick. 501; Brooklyn v. Patchen, 8 Wend. 47; Grand Rapids B. Co. v. Jarvis, 30 Mich. 308; Boston & L. R. Co. v. Salem R. Co., 2 Gray, 1. The municipality is not authorized by reason of its general control to impose a new or an additional use on the highway. State v. Trenton, 36 N. J. Law, 79; Rader v. Township of Union, 39 N. J. Law, 509; Allan v. Jones, 47 Ind. 438; United States v. Harris, 1 Sumn. 21, Fed. Cas. No. 15,315. Defendant's use of the land is for private purposes, and inconsistent with and exclusive of the public use. Plaintiff is entitled to an injunction restraining defendant from intrusion and misuse. Proprietors of Locks v. Nashua R. Co., 104 Mass. 1; Hamilton v. Annapolis R. Co., 1 Md. Ch. 107; Pierce v. Drew, 136 Mass. 75, per Allen, J.; Sterling's Appeal, 111 Pa. St. 35, 2 Atl. 105. Taking possession of the land against the will of the owner for any other use than that for which it has been lawfully appropriated is unlawful. Board of Trade T. Co. v. Barnett, supra; American R. T. Co. v. Connecticut T. Co., 49 Conn. 352; Chesapeake & P. T. Co. v. Mackenzie, 74 Md.

36, 21 Atl. 690; Broome v. New York & N. J. T. Co., 42 N. J. Eq.
141, 7 Atl. 851; Domestic T. Co. v. Newark, 49 N. J. Law, 344, 8
Atl. 128; Willis v. Erie T. & T. Co., 37 Minn. 347, 34 N. W. 337;
Stowers v. Postal T. Co., 68 Miss. 559, 9 South. 356; Pacific P. T.
Co. v. Irvine, 49 Fed. 113; Western Union T. Co. v. Williams, 86
Va. 696, 11 S. E. 106; Story v. New York E. R. Co., 90 N. Y. 122;
American T. Co. v. Pearce, 71 Md. 535, 18 Atl. 910; Rich v. City
of Minneapolis, 37 Minn. 423, 35 N. W. 2; Ellsworth v. Lord, 40
Minn. 337, 42 N. W. 389; Lamm v. Chicago, St. P. & M. Ry. Co., 45
Minn. 71, 47 N. W. 455; Schurmeier v. St. Paul & P. R. Co., 10
Minn. 59 (82); Harrington v. St. Paul & S. C. R. Co., 17 Minn. 188
(215); Carli v. Stillwater S. R. & T. Co., 28 Minn. 373, 10 N. W. 205;
Adams v. Hastings & D. R. Co., 18 Minn. 236 (260); Gray v. First
Div. St. Paul & P. R. Co., 13 Minn. 289 (315); Molitor v. First Div.
St. Paul & P. R. Co., 14 Minn. 212 (285). The owner of the fee parts
only with such rights as the public easement requires, and all other
rights, including free access to and from his adjacent land and the
highway, are reserved. Hovey v. Mayo, 43 Me. 322; Transylvania
University v. City of Lexington, 3 B. Mon. 25; Mayhew v. Norton,
17 Pick. 357; s. c., note, 28 Am. Dec. 302; Story v. New York E. R.
Co., supra; McCaffrey v. Smith, 41 Hun, 117. Plaintiff's right to
the relief demanded is clear. Ashley v. Port Huron, 35 Mich. 296;
Koopman v. Blodgett, 70 Mich. 610, 38 N. W. 649; Ryan v. Brown,
18 Mich. 196; East Pa. R. Co. v. Schollenberger, 54 Pa. St. 144;
De Witt v. Van Schoyk, 110 N. Y. 7, 17 N. E. 425; Warren Mills
v. New Orleans S. Co., 65 Miss. 391, 4 South. 298; 1 Pom. Eq. Jur.
§ 245; 3 Pom. Eq. Jur. § 1357; Chadbourne v. Zilsdorf, 34 Minn. 43,
24 N. W. 308; Cotton v. Mississippi & R. R. B. Co., 19 Minn. 129
(497); Gustafson v. Hamm, 56 Minn. 334, 57 N. W. 1054.

*Hale, Morgan & Montgomery,* for respondent.

The public easement in a public street is the public and common
right to use the same for the passage of persons and things, and for
the purposes incidental thereto. Newell v. Minneapolis, L. & M.
Ry. Co., 35 Minn. 112, 27 N. W. 839. The erection and maintenance
of telephone poles is not the imposition of an additional servitude.
Julia Building Ass'n v. Bell T. Co., 88 Mo. 258, 57 Am. Rep. 398;
Pierce v. Drew, 136 Mass. 75, 49 Am. Rep. 7; Chase v. Sutton M.

Co., 4 Cush. 152, 167; Boston v. Richardson, 13 Allen, 146, 160; McCormick v. District of Columbia, 4 Mackey, 396, 54 Am. Rep. 284; Irwin v. Great S. T. Co., 37 La. An. 63; Keasbey, Electric Wires, §§ 17, 18, 19; Willis v. Erie T. & T. Co., 37 Minn. 347, 34 N. W. 337.

MITCHELL, J. The defendant is a domestic corporation authorized to erect and maintain telephone exchanges and lines. It has constructed a telephone line between the cities of Minneapolis and St. Cloud, a part of which is on and along the side of a rural highway, the fee of which, subject to the public easement, is in the plaintiff, who is the owner of the abutting land. It was built without his consent and against his protest. It consists of poles planted in the soil at a distance of 170 feet from each other, upon which wires are stretched. The defendant claims the right to construct and maintain this line solely by virtue of G. S. 1894, § 2641.[1] This action was brought to compel the defendant to remove its poles and wires from the highway. It is not claimed that the line is not constructed in strict accordance with the requirements of the statute. Neither did the plaintiff either allege or prove that it has caused any substantial pecuniary damage or injury to himself or his property. He plants himself squarely upon the proposition that the erection and maintenance of telephone poles and wires is not within the public easement in a highway, but constitutes the imposition of an additional servitude upon his land; and that is the question presented by this appeal. The question is res integra in this state, and the decisions in other states upon it, as well as upon the kindred one as to telegraph lines, are conflicting. Hence we feel at liberty to decide the question entirely upon principle.

From the manner in which the case has been discussed by counsel, we assume that defendant's telephone line is for the use of the public upon payment of certain charges. Therefore the use to which

[1] That section reads: "Any telegraph or telephone corporation organized under this title has power and right to use the public roads and highways in this state, on the line of their route, for the purpose of erecting posts or poles on or along the same to sustain the wires or fixtures: provided, that the same shall be so located as in no way to interfere with the safety or convenience of ordinary travel on or over the said roads or highways."

the highway has been appropriated by the defendant is a public one. The transmission of intelligence by telegraph or telephone is a business of a public character, to be conducted under public control, in the same manner as the transportation of persons or property by common carriers. But, of course, the fact that this is a public use gives the legislature no right to authorize the taking of private property for it without paying compensation. The proposition is equally elementary that the acquisition by the public of one easement in land gives no right to another and different easement. The public cannot go beyond, but must be confined within, the general purpose for which the easement was granted or acquired from the owner of the soil. Hence whether an easement authorizes the use of land in a particular way depends upon the nature and extent of the easement. These propositions are so nearly axiomatic that they will not be disputed by any one.

The question, then, is, what is the nature and extent of the public easement in a highway? If there is any one fact established in the history of society and of the law itself, it is that the mode of exercising this easement is expansive, developing and growing as civilization advances. In the most primitive state of society the conception of a highway was merely a footpath; in a slightly more advanced state it included the idea of a way for pack animals; and, next, a way for vehicles drawn by animals,—constituting, respectively, the "iter," the "actus," and the "via" of the Romans. And thus the methods of using public highways expanded with the growth of civilization, until to-day our urban highways are devoted to a variety of uses not known in former times, and never dreamed of by the owners of the soil when the public easement was acquired. Hence it has become settled law that the easement is not limited to the particular methods of use in vogue when the easement was acquired, but includes all new and improved methods, the utility and general convenience of which may afterwards be discovered and developed in aid of the general purpose for which highways are designed. And it is not material that these new and improved methods of use were not contemplated by the owner of the land when the easement was acquired, and are more onerous to him than those then in use. Another proposition, which we believe to be sound, is that the public easement in a highway is not limited to travel or transportation of

persons or property in movable vehicles.    This is, doubtless, the
principal and most necessary use of highways, and in a less ad-
vanced state of society was the only known use, as the etymology
of the word "way" indicates.    And the courts, which, as a rule, are
exceedingly conservative in following old definitions, have often
seemed inclined to adhere to this original conception of the purpose
of a highway, and to exclude every form of use that does not strictly
come within it.    But it is now universally conceded that urban high-
ways may be used for constructing sewers and laying pipes for the
transmission of gas, water, and the like for public use.    Some courts
put this on the ground that these uses are merely incidental to and
in aid of travel on the streets.    Other courts put it on the ground
that such uses are contemplated when the easement in urban ways
is acquired, but not in the case of rural highways.    But it seems to
us that neither of these reasons is either correct or satisfactory.
The uses referred to of urban streets are not in aid of travel, but
are themselves independent and primary uses, although all within
the general purpose for which highways are designed.    Neither can
a distinction between urban and rural ways be sustained on the
ground that such uses were contemplated when the public easement
was acquired in the former but not when the easement was acquired
in the latter.    As a matter of fact, most of these uses were unknown
when the public easement was acquired in many of the streets in the
older cities.    Indeed, many of what are now urban highways were
merely country roads when the public acquired its easement in them,
and doubtless many highways that are now merely country roads
will in time become urban streets.    When such changes occur, will
the abutting owners be entitled to new compensation before the
public can build sewers or lay water or gas pipes in these streets?

It seems to us that a limitation of the public easement in high-
ways to travel and the transportation of persons and property in
movable vehicles is too narrow.    In our judgment, public highways,
whether urban or rural, are designed as avenues of communication;
and, if the original conception of a highway was limited to travel and
transportation of property in movable vehicles, it was because these
were the only modes of communication then known; that as civili-
zation advances, and new and improved methods of communication
and transportation are developed, these are all in aid of and with-

in the general purpose for which highways are designed. Whether it be travel, the transportation of persons and property, or the transmission of intelligence, and whether accomplished by old methods or by new ones, they are all included within the public "highway easement," and impose no additional servitude on the land, provided they are not inconsistent with the reasonably safe and practical use of the highway in other and usual and necessary modes, and provided they do not unreasonably impair the special easements of abutting owners in the street for purposes of access, light, and air. It is impracticable, as well as dangerous, to attempt to lay down, except in this general form, any rule or test of universal application as to what is or what is not a legitimate "street or highway use." Courts have often attempted to do so, but have always been compelled by the logic of events to shift their ground. The only safe way is to keep in mind the general purpose of highways, and adopt a gradual process of inclusion and exclusion as cases arise. This court has held, in common with the great majority of courts, that an ordinary commercial railroad imposes an additional servitude on a street, and we applied a test as to what did and did not constitute an additional servitude. As far as it went, and as applied to such a case, the test was doubtless correct; but, after all, the bottom fact upon which the decision really rests was that such an appropriation of a street was practically subversive of its use by the public in the ordinary way, and also unreasonably impaired the special easements of abutting owners. So, too, the New York elevated railway cases were discussed and reasoned at great length; but in their final analysis the real ground upon which those structures were held to impose an additional servitude was, not that they were immovable, or were above the surface of the ground, but because they unreasonably impaired the easements of abutting owners in the streets for purposes of access, light, and air. How far a particular method of using a street must interfere with other methods of its use by the public, or with the special easements of abutting owners, in order to constitute an additional servitude or amount to a nuisance, is not involved in the present case.

An argument sometimes advanced why telegraph and telephone lines constitute an additional servitude is that the structures are immovable. It is said that "the primary law of the street is motion."

It is true, motion is the law of the street, in the sense that the person or thing to be transmitted or transported must move; but it is not true in the sense that the medium or agency by or through which it is conveyed or transmitted must move. Pipes laid for the transmission of water, gas, and steam are immovable. So are the tracks of street railways, also the poles and wires of the trolley system. And it can make no difference in principle whether the immovable structure is on, under, or above the surface of the ground, for the rights of the owner of the fee are the same in either case. Subject only to the public easement for highway purposes, he remains the owner of the land upward and downward indefinitely. If the transmission of intelligence by telegraph or telephone is not included in the public easement in a highway, it would be equally an invasion of his rights of property, even if the wires were placed underground. If an immovable structure in a highway constitutes an additional servitude, it is not merely because it is immovable, but because it unreasonably interferes with the general use of the street by the public, or because it unreasonably impairs the special easements of abutting owners.

It can hardly be necessary to say that the fact that telephone and telegraph lines are owned by private companies, and not by the state, is not material, provided they are authorized by the state, and are devoted to a public use. No such structures can be put in the highways except by authority of the state, and then only for a public use. The state can say how they shall be constructed and operated. When public interests demand, the state can require the wires to be put under ground, as they, doubtless, should be in cities of any considerable size. So far as there is any distinction between rural and urban highways, there would be much more reason for holding such structures an additional servitude in the latter than in the former. It is a matter of common knowledge that telegraph and telephone lines along the side of a country road rarely, if ever, appreciably interfere with either public travel or the easements of the abutting landowners; whereas in the cities, especially on business streets, where the buildings extend out to the line of the street, the numerous wires stretched upon the crossarms frequently materially interfere with access, light, and air, as well as render protection of the buildings more difficult in case of fire.

There is a further consideration that is entitled to weight. We cannot pretend ignorance of the fact that in this state, from the earliest times, the right to appropriate highways for telegraph lines has been asserted, and almost universally acquiesced in by the owners of abutting estates. The legislature has for nearly 30 years assumed that this right existed, by enacting a statute authorizing it. In 1881, when the newer invention of telephones was coming into general use, the legislature amended the statute extending the same right to telephone companies. This has also been generally acquiesced in by the public. This constitutes a popular construction of "the law of the road," and a popular verdict as to what public convenience requires, which courts can hardly afford to ignore. The telephone is still a comparatively new invention. Notwithstanding the high charges for its use which the proprietors of the patents have been enabled to exact, it has already become a common medium of communication, not only between residents of the same city, but also between neighboring towns and villages, and, with the development of the long-distance telephone, even between towns and cities hundreds of miles apart. With the expiration of the patents, the charges for its use are now being rapidly reduced. The present possibilities of the telephone as a means of communication are very great. It is not impossible that it may soon become a common and cheap mode of communication, not merely between towns, but also between residents of the country and of the towns, or even between the rural residents themselves. It may be, as advocated by many as to telegraphs, that the government will at some day assume the function of furnishing all such service to the public. Telephone lines must be placed in the highways. It is the only practicable place to put them. The only question is whether a new right to do so must be acquired from the owners of property abutting on on the highways.

We are not unmindful that private property cannot be taken for a public use without compensation, however important that public use is. We are not forgetful of the fact that care should be taken that, in the popular zeal for modern public improvements, the burden of furnishing these improvements should not be shifted from the public, and imposed upon any particular class of individuals. But viewing, as we do, highways as being designed as public avenues of

travel, traffic, and communication, the use of which is not necessarily limited to travel and the transportation of property in moving vehicles, but extends as well to communication by the transmission of intelligence, it seems to us that such a use of a highway is within the general purpose for which highways are designed, and, within the limitations which we have suggested, does not impose an additional servitude upon the land; in short, that it is merely a newly-discovered method of using the old public easement.

We have thus far referred to the appropriation of highways for telegraphs and for telephones as if both stood on the same ground, and involved the same principle. But the only question before us is whether a telephone line imposes an additional servitude on a highway; and the decision of the court must be deemed to be confined to that question, leaving the question as to telegraph lines to be authoritatively decided when it is presented and argued, so that, if there be any distinction between the two, an opportunity may be given to point it out.

Order affirmed.

START, C. J. I dissent. The locus in quo in this case is a country highway, the title in fee of which, subject to the public easement, is in the appellant. The respondent is a corporation of this state, and, as such, authorized to erect and maintain telephone exchanges and lines. It has constructed and operates such a line between the cities of Minneapolis and St. Cloud, and in so doing, without the consent and against the protest of the appellant, it entered upon the highway in question, and erected and now maintains poles, planted in the soil thereof, and upon them stretched the wires used for its telephone line. The respondent claims the right so to erect and maintain the poles and wires in this highway without compensation to appellant, by virtue of legislative authority. G. S. 1894, § 2641. Whether or not his claim is valid depends upon what answer shall be given to the question, is the erection and maintenance, under legislative authority, of poles and wires in a rural highway, for a telephone line, an additional servitude, for which the abutting landowner is entitled to compensation? An answer to this question involves a consideration of the purposes for which a highway in the country, in this state, is acquired. Is the right to establish and

operate telephone lines therein, under legislative authority, included by implication in such purposes? If such use of the highway is outside of the scope of the public easement therein, then it is an additional servitude, for which the owner of the soil has never been compensated, and the legislature cannot authorize such use except upon condition that compensation be made to the owner. A highway primarily is simply a public easement or servitude, for travel and passage of persons, animals, and things, carrying with it, as an incident, the right of the public to use the soil for the purpose of the repair and improvement of the way, and, in cities and populous places, the further right to use the street for the more general purposes of sewerage, the distribution of water and light, and the furtherance of public health, safety, and convenience. The owner of the land over which the highway passes retains the fee thereof and all rights of property therein not incompatible with the public easement therein, as here defined. 2 Dill. Mun. Corp. § 688; Ang. & D. Highw. § 301.

While the fundamental idea of a highway is that it is for public travel, yet the purposes for which it was acquired are not limited to travel and passage in the then known vehicles and methods, for all new vehicles and methods of travel thereon, which are not inconsistent with the safe and practical use of the highway for travel in the ordinary methods, are included in the public easement. Accordingly, it has been held by nearly all recent authorities that the operation of a street railway for the transportation of persons only, whether the motive power is animal or mechanical, including electricity, with the necessary poles and wires to communicate the power to the car or vehicle to be moved, is not an additional servitude. Taggart v. Newport St. Ry. Co., 16 R. I. 668, 19 Atl. 326; Halsey v. Rapid Trans. St. Ry. Co., 47 N. J. Eq. 380, 20 Atl. 859. The authorities, in reference to such street railways, proceed upon the basis that such new use of the street is similar to that for which the street was originally acquired; or, in other words, it is merely a newly-discovered method of exercising the old public easement for travel and passage of persons and things along the public street. This principle has been extended, by a limited number of adjudged cases, to the erection and use of telephone and telegraph poles and wires in the streets, for the purpose of transmitting intelligence. The

analogy, however, between a telephone line and the purposes for which a country highway is acquired is remote, if not fanciful; and it is safe to say that such use of the highway was not within the contemplation of the parties when the damages for the public ease- ment were assessed or the right of passage dedicated. The use of the highway for a telephone line is essentially distinct from its use for travel. The right of the public in the ordinary highway is to pass along upon it, not to remain stationary; and it would be just as reasonable to claim that towers erected in the highway for the pur- pose of transmitting intelligence by signal-lights were not an ad- ditional servitude as to make such a claim for telephone poles. In each case there would be an exclusive use and possession of a por- tion of the highway, in no manner connected with the movement of vehicles or cars of any kind, which cannot be properly regarded as a new method of exercising the old public easement for travel and passage. The adjudged cases upon this subject are conflicting, but the later cases and the weight of authority sustain the doctrine that a telegraph or telephone line along the highway, where the fee there- of is in the abutting owner, is foreign to its use, and an additional servitude, for which such owner is entitled to compensation; and that the legislature cannot authorize the imposition of such serv- itude without also providing for such compensation. Willis v. Erie T. & T. Co., 37 Minn. 347, 34 N. W. 337; Board of Trade T. Co. v. Barnett, 107 Ill. 507; Broome v. New York & N. J. T. Co., 42 N. J. Eq. 141, 7 Atl. 851; Western U. T. Co. v. Williams, 86 Va. 696, 11 S. E. 106; Stowers v. Postal T. C. Co., 68 Miss. 559, 9 South. 356; Chesapeake & P. T. Co. v. Mackenzie, 74 Md. 36, 21 Atl. 690, and 28 Am. St. Rep. 219, and notes; Pacific P. T. Co. v. Irvine, 49 Fed. 113; Lewis, Em. Dom. § 131; Eels v. American T. & T. Co., 143 N. Y. 133, 38 N. E. 202; Elliott, Roads & S. 534; Tied. Mun. Corp. § 297. The opposite doctrine is held in the following cases, by a divided court, except in the last case cited, and in that one the fee was in the public: Pierce v. Drew, 136 Mass. 75; Julia Building Ass'n v. Bell T. Co., 88 Mo. 258; People v. Eaton, 100 Mich. 208, 59 N. W. 145; Irwin v. Great S. T. Co., 37 La. An. 63. In the first two cases the dissenting opinions are so vigorous as to large- ly neutralize the decisions as authorities outside of the jurisdic- tion of the court announcing them. The latest decision upon this

question is that of the New York court of appeals in the case of Eels v. American T. & T. Co., which was in all substantial particulars similar to the one at bar. It ably discusses the question on principle, and reaches the unanimous conclusion that the occupation of a rural highway by a telegraph and telephone company for the erection of its poles is an additional servitude, for which the owner of the fee is entitled to compensation.

I am of the opinion, upon both principle and authority, that the planting of telephone posts upon a public highway in the country, the fee whereof is in the abutting owner, is an additional servitude, an appropriation of private property, and unlawful as to such owner, unless the right to do so is acquired by contract or condemnation. In reaching this conclusion, I am not unmindful of the fact that the use of the telephone is a beneficial and public use; but private property cannot be taken for public use without compensation first paid or secured, no matter how small its value. This is the constitutional right of the humblest individual, which must not be lost sight of in our enthusiasm over the public benefits conferred by the telegraph and telephone, or in our desire to promote the public welfare.

BUCK, J. I also dissent from the opinion of the majority of the court, and, while it is perhaps unnecessary for me to say anything in addition to what is said by the Chief Justice, yet the importance of the question involved may justify me in stating my own views on the subject.

There are several methods by which a highway may be established; for instance, by condemnation, dedication, and by prescription. In the case of condemnation, damages are usually assessed by way of compensation for the injury sustained. But, in case of dedication and prescription, damages are not assessed, although in law all of these methods are equally effective. Yet, as in cases of prescription where a man's property is secured for public use without compensation, there should not be added to such property a greater burden than was contemplated by the owner when he suffered his rights in the premises to become inferior to those of the public. It is a well-established rule of law that the owner of land burdened with a highway has all of the rights of the soil not inconsistent with its

use for public purposes and for which it was originally established. The title to the soil remains in the owner, and any interference with it by any one to the injury of the owner, and not consistent with the purpose for which it was originally established, renders the person so interfering liable in damages. The constitutional provision, so familiar to all, that private property shall not be taken for public use without just compensation first paid or secured, ought to stand as a continual barrier against all wrongful encroachments upon private rights. The aggregate of the private rights injuriously affected by the majority opinion in this state is very great, possibly greater than those which will be benefited by the result of that opinion. The owners of urban, suburban, and rural property are very numerous, and must necessarily be thus seriously affected in many instances. Now, a public highway is established for an uninterrupted passage for animals and vehicles, and to allow persons to pass and repass, to go and return, at their pleasure, and without interruption. It is an easement which the public have in the land, with the incidental right on the part of the public authorities to keep it in repair. The damages are accepted by the owner with the understanding that it is for this purpose that the highway is established. Or, if the highway is established by dedication or user, the same implication would arise. Now, is the erection of telephone poles in a street or highway, with its numerous wires connecting the poles upon crossbars, an entirely new use of the highway, and an additional burden to the owner, for which additional compensation should be provided, or is it a mere modification of the public servitude? If it is a change wholly foreign to the ordinary purposes of a highway, then the adjoining owner is entitled to compensation.

Dillon on Municipal Corporations (volume 2, § 698a) says: "On the whole, the safer and perhaps sounder view is that such a use of the street or highway, attended, as it may be, especially in cities, with serious damage and inconvenience to the abutting owner, is not a street or highway use proper, and hence entitles such owner to compensation for such use, or for any actual injury to his property caused by poles and lines of wire placed in front thereof." In the prevailing opinion in this case it is said that, "if there is any one fact established in the history of society and of the law itself, it is that the mode of exercising this easement is expansive, develop-

ing, and growing as civilization advances." If by this is meant that certain changed conditions may arise which, for the first time, demand the application of the common law to such changed conditions, the statement may be correct; but the law itself always existed, although it may never before have been applied or called into actual operation, and especially so as to establish a precedent.    Public sentiment may change, and the onward spirit of the times demand that it shall have its way, but the well-established principles of the common law are unchangeable, and the private right which existed 50, 100, or 1,000 years ago should now be as sacred and inviolate as then.    The current of public sentiment, changing though it may, does not create new rights; and while it does, step by step, insidiously attempt to appropriate private property for new uses, it should not be granted success, under the guise of great public benefit, to the injury of the individual.    And while we speak of private or individual rights in this case, where only one individual's rights are to be determined, yet, in a broader sense, a great body of the public may be seriously affected by it, who are remediless under the rule laid down in the majority opinion.

Now, a new use, even if beneficial to the public, does not necessarily create a new right as against the owner of the land.    The primary question is, does it constitute an essential change, so as to create an additional burden?    If so, then it is immaterial how beneficial the new and improved methods of public travel or the transmission of intelligence by telegraph or telephone, or whether the business is to be conducted under public control.    It is also quite immaterial that the erection of these telephone poles was authorized by a legislative enactment.    It needs something more than a legislative consent to deprive a man of his property or prevent his absolute control of it.    The state itself would have just as much right to erect telephone poles in the highway as to authorize any corporation or private person to do so, and in neither case should it be permitted without compensation.    Such an appropriation of the streets is destructive of the ordinary use as public ways, and inconsistent with the purpose for which they were originally established.

In the case of Eels v. American T. & T. Co., 143 N. Y. 133, 38 N. E. 202, Justice Peckham, speaking of certain prior decisions of the New York circuit court of appeals, said:   "They show that the

primary or fundamental idea of a highway is that it is a place for uninterrupted passage by men, animals, or vehicles, and a place by which to afford light, air, and access to the property of abutting owners, who, in this respect, enjoy a greater interest in the street than the general public, even though their title to the land stops with the exterior line of the street.  It is not a place which can be permanently and exclusively appropriated to the use of any person or corporation, no matter what the business or object of the latter might be.  It was because the highway was permanently, and, to some extent, exclusively appropriated by the elevated railroads that it was held that their erection, without the consent of the abutting owners, was illegal."  This was said of the streets in New York City, where the title of the streets is in the city.  It seems to me that this rule can be applied in this state with much greater force, where the fee in the street is in the abutting owner.  The principle announced in the majority opinion would, of course, apply to our large and populous cities, as well as to rural property.  It is a well-known fact that the streets in our cities are lined with these telegraph and telephone poles, covered with crossbars, and strung with numerous wires, making these erections in some respects dangerous, and interfering with the free and convenient use of the property.  If one person or company can do this, another one may do the same.  The mere fact that the owner may have access to his abutting property because there is a sufficient space left between those poles for him to pass is certainly a poor justification for creating an additional burden upon his property, without giving him any remedy for damages.  In large cities these numerous erections may exclude light and air, besides being an inconvenience in the use of the street, and a nuisance in several other respects.  And the erections are not to be temporary, but permanent, continuous, and excluding the use by the public of that portion of the highway occupied by them.  Such an exclusive use of a portion of the highway, whether old or new, it seems to me, is not included within the public highway easement. If telegraph and telephone poles 2 feet in diameter, and 30 or 40 feet high, covered with crossbars and numerous wires strung from one pole to another, erected in the highway in front of a man's residence or business property, can be there permanently maintained, why cannot a guard house be erected there also as a permanent

structure, upon the ground that the poles and wires need protection against depredators or injury? The erection of telegraph and telephone poles is not merely a new method of exercising old rights, but the addition of a new servitude and essentially a new burden upon the street. Viewed in this light, if the necessities or . luxuries of modern life are needed, let those who seek their enjoyment and benefit pay for them, and not secure them at the expense of additional burdens imposed upon private property. It is this compulsory yielding up of private rights and private property to concentrated power and wealth in the hands of the few, under the demands of a so-called "progressive civilization," that needs judicial care and its conservative force to see that no new appropriation of lands not embraced in the original dedication or condemnation shall be permitted. If the erection of telephone and telegraph poles in our public streets and highways is simply a new and improved method of the use of the street, I fail to see why any legislative permission was necessary, because the telephone company would in such case have the same right to the use of the street as any traveler thereon.

But suppose the right to erect these electrical lines was included in the original establishment of the public streets and highways; yet it must be conceded that they do constitute damages in a greater or less degree, and, in condemnation cases, must the municipalities pay the abutting owner for such damages? By what constitutional provision or statutory law are municipal corporations authorized to levy a tax to pay the damages for a private individual or a corporation to erect these poles and carry on the telephone or telegraph business? I assume that no such right exists, and shall we not in the coming time be met with this serious question of whether, upon the exercise of the power of eminent domain by condemnation proceedings, the possible or probable erection of such poles will not constitute an element of damage, to be assessed and paid by the people to the abutting owner before his property can be taken for public use? And in such case will not further complications arise in case of the vacation of the streets or highways where these erections have been made? The great weight of authorities is against the view of the majority of this court, and the late decisions of eminent courts are in accordance with the views which I have endeavored to express.